Good morning, Your Honors. May it please the Court, my name is Corey Parker, and I represent the appellant Joseph Weinberg. I respectfully request five minutes for rebuttal. Your Honors, this appeal focuses on two primary issues. Number one, whether the District Court erred by granting summary judgment in favor of the defendant, finding that the IIED claim is time barred when there is, in actuality, a dispute of material facts surrounding the appellant's insanity tolling argument. And number two, whether the District Court erred in granting summary judgment to the defendant on the IIED claim by finding that the claim lacked outrageous conduct when there was enough evidence when combining the defendant's actions together with the appellant's mental state to show outrageousness in this case. And the Court reviewing this de novo would have to conclude that, or mirror the District Court judge's conclusion, that summary judgment is appropriate when there exists no genuine issue as to any material fact. And we contend that there were certainly issues of material fact in this case, genuine issues. The credibility is something for the jury to determine. But in this case, the inferences should have been toward the non-moving party. Now, with respect to the tolling argument, the record contains an MRI revealing that the appellant had four lesions on his brain as a result of a traumatic brain injury. Was there expert testimony that you submitted or that counsel below submitted that showed that the lesions on the brain meant or raised an inference that your client was insane during the relevant period of time? No, Your Honor. There was not expert testimony. But the lower court counsel did stand on the MRI. That was part of the record and can be found in the excerpts of record on page 332 and 243. This medical evidence alone lends even more credence to the fact that my client was incapacitated. You can analogize this to the Zolov v. International Jet Leasing case, where the appellant in that case, Zolov, was rendered incompetent by grave head injuries. So there we have it. Wasn't he unconscious? It's my understanding he was for part of the time. And I understand, Your Honor, the distinction that would be made here. But the fact that my client had an MRI revealing that there were lesions on his brain, the fact that in sworn testimony in both a deposition and later in an affidavit, he testified that he was incapable of caring for himself or his affairs after his constructive termination. But wasn't he conducting all kinds of things to continue carrying on his affairs? Wasn't he negotiating his severance package, rejecting the offered package, resigned, looking for a new job? Wasn't there a whole lot of other things he was doing during this time period? Well, Your Honors, it's my understanding from the record that he was doing that prior to his termination. But when he was terminated or when he did finish with Valiant, it was at that point that this incapacity began. According to the testimony, according to the medical evidence provided that the statute of limitations or as pertains to the statute of limitations, the insanity didn't manifest until August 5th, 2013. So what is the evidence that, other than his saying, you know, I couldn't conduct my affairs, what is the evidence that shows, for example, on August 5th or August 6th, that your client was insane in the light most favorable to him other than him saying, I couldn't manage my affairs? Well, Your Honor, and that's why I really am underscoring this MRI, because we don't just have an appellant who is simply a party who is simply saying, I'm stressed out and I'm incapable of handling my affairs. That would be a different story, and that's what Respondent is essentially inferring. With the MRI, wouldn't you at the very least need some evidence that would suggest to the district court that brain lesions cause insanity, cause your inability to manage your affairs on a day-to-day basis? And, Your Honor, that's a fair question. Feely v. Southern Pacific lays out the standard to some degree, stating, quote, the standard expressed in the case actually requires only some mental condition, which renders the plaintiff incapable. So when we look at the definition of insanity, the standard is somewhat low in that we only need some mental condition. We believe that that mental condition was shown, and had this gone to a jury, there would be more evidence. There probably would have been expert testimony. There would have been credibility determinations to be made. But just on its face, which the district court had in front of them, there was enough to say that there was a genuine issue of material factor, and that's our argument. Counsel, you were not counsel below, correct? I was not, Your Honor. So, I mean, basically this came up after there was a motion made, and somebody figured out maybe they filed this complaint one day too late? Well, Your Honor, that is certainly probably the argument that respondent would make, and I can understand the court's skepticism and perhaps the district court's skepticism, but we have an appellant that has multiple sclerosis, right, diagnosed, that has some significant health issues, and that goes to the second issue about an eggshell plaintiff, that the lower court didn't consider how egregious the respondent's entire course of conduct was against the appellant in light of his more fragile emotional state. That does apply here, and the court didn't take into consideration the testimony from my client that his supervisor was aware of this illness. And getting directly to answering your question, Your Honor, the statute of limitations, there was not enough evidence to make that inference. We have here an MRI. We have here testimony from my client. We have some very significant allegations that were made by my client that he supported with evidence about what this employee, who we argued was functioning as an employer and making these threats about blood sport, about finding it funny somebody committed suicide. My client was subjected to all this hostile environment. That coupled with the MRI, that coupled with the brain injury that resulted from the MRI, four lesions on one's brain is not something to take lightly. I understand that. But to toll the statute, this happened on August 5th, right? He argued he was incapacitated on August 5th. And to toll the statute, it wouldn't run unless he could show that he was incapacitated on that date, right? Right, Your Honor. Okay. And so didn't the lower court find that it was on that day that he was managing his affairs, he was negotiating his severance package, he was rejecting the offered package? Didn't that happen on that date, and that's why the statute is not being tolled? Isn't that what the crux of this is? We would argue that the lower court put too high of a burden on my client based on the standard. Again, the standard being only some mental condition. My client did testify and did talk about his multiple sclerosis, did talk about how he wasn't managing his affairs during that time. Well, the standard is incapacitation. Yes, Your Honor. So we have to connect the mental condition, the lesions on the brain, to incapacitation. I have to say, I may be the most skeptical person, and it's not of you, but how could there not be one day of incapacitation? And I could also see the argument, which I'm not sure has been made, that even though he did reject the severance offer, that's just illustration of his incapacitation because it was obviously something he should have accepted. I don't think that's an argument being made. But, I mean, there needs to be some evidence that, like, oh, this thing was too good to be true, and obviously he was mentally incapacitated because he didn't accept it. Right. And, Your Honor, I think that very – No, don't say right. Well, Your Honor, the very analysis that you're doing, the very discussion that you're bringing forth is a discussion of the issues. And the argument here is that that discussion of issues should have been before a jury, that credibility should have been taken into consideration, expert testimony would have been taken into consideration. Well, it's lacking the evidence to support the argument I just threw out to you. Your Honor, based on the record, we would contend that there was evidence that my client was incapacitated, that, yes, there was a severance package, and, yes, my client perhaps declined it, but he believes he did make the right decision by declining it because he felt like it was a hostile work environment and that they were trying to essentially get him to take this by – and him waiving his rights to – But he's making that decision on the exact day you say he was incapacitated. Well, and I think that being that we're not medical experts, right, we're not equipped necessarily to make that determination of incapacitation, that's why that should have gone to a jury. Well, I mean, one could say that's why your co-counsel or your counsel below needed to present that evidence to the district judge to create a disputed issue of fact, which they didn't. And, Your Honor, I would just ask this court to look at the record with regard to my client's deposition, and as I cited in the brief and pointed to, the incapacity that he was dealing with, the fact that the medical conditions were intertwined with his mental and emotional breakdown that persisted, because we believe that the record would show that. Now, yes, there was a severance agreement that was turned down, but there's nothing saying that later that day he couldn't have been in shambles and unable to care for himself and unable to make any decisions on his own, and I believe there was – Counsel, didn't you say you wanted to save five minutes? Yes, Your Honor. Thank you. I'll reserve the rest for rebuttal. Thank you. May it please the Court, my name is Jessica Linehan, counsel for Appalieve. I'd like to just jump straight into the point that counsel made regarding the MRI.  If you look at the excerpts of the record at 332 and 333, there's testimony from Mr. Weinberg saying that at some point after he rejected the severance offer from Valiant, and likely in conjunction with the time where he's trying to pursue a federal disability benefits claim, he makes note of the fact that he had had an MRI and that MRI showed certain lesions on his brain. But when pressed in the record, when pressed in testimony, he was asked, did any medical provider tell you that there's any – that you had the lesions while you worked for Valiant or that these lesions were caused by your experience at Valiant? And just by way of background, there's no dispute that Mr. Weinberg has had multiple sclerosis since 2009. He's had at least eight or nine employers between 2009 and his time joining Valiant in 2013. And when asked if any medical provider had connected his lesions with his time at Valiant, either did they exist at the time, he said nobody ever wrote it down and he couldn't make the connection. And that's in the evidence of the record. And there was no expert testimony? No, Your Honor. No, there was no expert testimony. And I think it's important to note that counsel below in the district court, the opposing counsel, they never submitted an MRI. It's just Mr. Weinberg's explanation of the fact that he'd had an MRI at some point after his separation from Valiant. But as somebody who has multiple sclerosis, the fact that he may have a lesion on his brain, that is not synonymous with saying that he was insane within the meaning of CCP 352. I mean, to the contrary. He was able to work continuously since his MS diagnosis. While he was with Valiant, he was a fine performer. He performed well enough to the extent that he was one of the few people within IT that there was discussions that perhaps he could, although his Scottsdale site was going to shut down, perhaps he could come to New Jersey and work for New Jersey. There's nothing in the record showing this MRI, showing the lesions on the brain. All we have is his testimony regarding lesions. He opted not to present that evidence. And more importantly, there's nothing suggesting that these lesions rendered him incapacitated. Even after his separation from Valiant, he was pursuing a disability, a federal disability claim for disability benefits. He moved residence. He was able to apply for COBRA. He did many things that suggest that he was functional. He's not like the, there was a reference to Feely. In that case, the employee was in a coma for 12 days. So there does, in fact, need to be something more than just some condition. The person who's seeking to apply the tolling argument needs to actually be incapacitated and unable to deal with their affairs, understand the legal consequences of their action. And there's no evidence of that here.  That was Mr. Weinberg's burden to present evidence to that. Valiant presented evidence that on August 5th, he showed up for work. In fact, on August 4th, he wrote a grammatically great, well-formatted multi-paragraph email explaining why he didn't want to relocate to the East Coast because his site was shutting down. He gave an explanation for that. And in that email, he said, I think it would be in the best interest of Valiant and the best interest of myself that I have a term, that I end employment on the 6th and that Valiant give me three months severance. And the response from HR on the 4th was, well, we'll show you the severance agreements that we have. And on the 5th, at his request, the company met with him. So he had a workplace meeting on the 5th. He says that he reviewed the severance agreement and the severance package, the materials that went with the actual agreement. And he testified that he rejected the severance agreement. And he testified, I rejected the severance agreement because I understood that it would require me to waive my rights. So this isn't even just a matter of being overwhelmed by a document. He made the conscious decision that this would have required – it was a release, severance in exchange for a release. And he understood that. And then on August 5th, he had the wherewithal to then go back to his computer workstation and type an email to his boss, Steve Scavone, that it was entitled Notice of Resignation, that I've been presented with a severance packet from HR and I don't agree with the term set. And he packed up his stuff and he left. And I thought it was an interesting question in terms of, is there something more to the fact that why would anybody reject severance? Well, he rejected it because he was being asked to waive his rights, which other than the fact that his lawsuit was filed a day too late, he might have been able to assert. I agree, Your Honor, but there's also more to it. And it's an interesting reality. Mr. Weinberg knew that – because at the Scottsville location, he knew that the site was going to be shutting down. It was on this sort of long windup. And as somebody – because he was in IT and because he was a valuable employee, the severance agreement that was presented to him was not on the give me three months and I'll walk on the sixth. What that severance agreement said was, well, you stay on until October 2013 to have some continuation, and then you'll get some severance after that. So it involved some transition. And Mr. Weinberg, because he had known that this shutdown was coming in July, he interviewed for other employment, and he received an offer from another company unrelated to Valiant called Data Shield. So he had this offer in hand on August 4th when he sent the email saying, hey, I propose that we end it on August 6th, give me some severance, and I go on my way. He already had a job offer. So I think staying until October would have probably put a kink in that scenario. So he left, and he began work at Data Shield on August 12th, on the next Monday after his resignation. So I think it's a two-part issue as to why would anybody reject money on the table, despite the fact that it does involve a waiver of rights, as most releases do. I have nothing further unless Your Honors have any questions for me. No, okay. Thank you, counsel. You have rebuttal time. Thank you, Your Honors. And briefly I'll conclude that I would ask the court to really take into account my client's MS, that that is a condition that can exacerbate a number of different feelings that one may have and stresses that one may have. It can take it to the next level. And had he not been an eggshell plaintiff, and had he simply been someone that was experiencing stress and financial strain, that would be one thing. But he has this condition, and that has to be taken into account. And it's our position that the district court really didn't take that into account or kind of devalued or minimized that condition. And that condition alone, we believe, coupled with the hostility that he experienced and his testimony about now not having a job, he just had his second child, having no health insurance and having to pay for COBRA, the dire financial situation, all coupled with the hostility that he was experiencing at the workplace, which I believe there's significant evidence to support that, all would lead to the conclusion that there was a genuine issue of material fact, that had it proceeded to trial, there would have been expert testimony, there would have been additional credibility determinations to be made, because unfortunately we can't make that now. My client is not here. He can't testify. That opportunity was not provided to him, and he did explain in depth in his deposition and his opportunity all the very difficult strain that he was going through coupled with his MS and the lesions. And his testimony, there was not the opportunity for the trial judge to determine his credibility and determine whether he was telling the truth or what his motivation was or whether he was just doing this because they missed the statute by a day. The role of the lower court was to take his testimony essentially as true and supported by his reasoning that he provided and to really determine whether or not there was a genuine issue of material fact, and we believe that there was. We believe also that the briefing satisfies the second issue that was brought before this court about the outrageous conduct, and there's plenty of case law and examples of the employer's conduct to support that. So thank you. All right. Thank you, counsel. So Weinberg v. Valiant Pharmaceuticals is submitted.
judges: Wardlaw, Cardone, Bennett